## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **20-11564-FDS** |
| ) | |
| **LINCOLN-SUDBURY REGIONAL** ) | |
| **SCHOOL COMMITTEE,** ) | |
| **LINCOLN-SUDBURY REGIONAL** ) | |
| **SCHOOL DISTRICT, BELLA WONG,** ) | |
| **AIDA RAMOS, PETER ELENBAAS,** ) | |
| **JASON MEDEIROS, SANDY** ) | |
| **CRAWFORD, ELEANOR BURKE, and** ) | |
| **LESLIE PATTERSON,** ) | |
| ) | |
| **Defendants.** ) | |
| ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS

SAYLOR, C.J.

This is an action concerning the response of a high school to a reported case of sexual assault. Plaintiff John Doe, a former student at Lincoln-Sudbury Regional High School, has sued Lincoln-Sudbury Regional School Committee, Lincoln-Sudbury Regional School District, and several school officials. The complaint alleges that they violated John's due-process rights, and committed various other violations of federal law, after an allegation of sexual assault was made against him by another former student.

Defendants have moved to dismiss the complaint. For the following reasons, that motion will be granted in part and denied in part.

I.      **Background**

     A.      **Factual Background**

The following facts are set forth as alleged in the complaint.

     1.      **The Parties**

In the fall of 2013, "John Doe" was a freshman at Lincoln-Sudbury Regional High School ("LSRHS").  (Compl. ¶ 1).  He was then 14 years old.  (*Id.*).  He attended LSRHS until his graduation in June 2017.  (*Id.* ¶ 8).

Lincoln-Sudbury Regional School District is the governing body that operates LSRHS. (*Id.* ¶ 9).  Lincoln-Sudbury Regional School Committee is the policy-making body for the district.  (*Id.* ¶ 10).

Bella Wong is the superintendent of the district and the principal of LSRHS.  (*Id.* ¶ 11). Aida Ramos and Peter Elenbaas are the Title IX Co-Chairs of LSRHS.  (*Id.* ¶¶ 12-13).  Leslie Patterson is the Housemaster of East House, the LSRHS house to which John was assigned.  (*Id.* ¶ 14).  Jason Medeiros, Sandy Crawford, and Eleanor Burke are housemasters of other LSRHS houses.  (*Id.* ¶¶ 15-17).

     2.      **The November 1, 2013 Incident**

On November 1, 2013, John and "Jane Roe," then a sophomore at LSRHS, attended a football game on the school's campus.  (*Id.* ¶¶ 21, 27).  John and Jane had previously been in a relationship.  (*Id.* ¶ 22).  John ended that relationship in October 2013, and Jane began dating "Female Student 2."  (*Id.* ¶¶ 23-25).

The complaint alleges that Jane texted John during the football game and asked him to meet her at a location away from the game.  (*Id.* ¶ 29).  According to the complaint, Jane arrived at that location with "Male Student 2" and "Male Student 3."  (*Id.* ¶ 30).  After Male Student 3 left the area, Jane, John, and Male Student 2 began to engage in sexual touching.  (*Id.* ¶ 31).  The

complaint alleges that Jane initiated the contact by kissing and touching John, and then engaged in further sexual contact with Male Student 2.  (*Id.*).  While the contact was occurring, Jane was giggling and using FaceTime to communicate with Female Student 2.  (*Id.*).  After ending the FaceTime call with Female Student 2, Jane began to cry and left the area.  (*Id.*).[1]

### 3.    Jane's Report of the Incident

About one week later, on November 7, 2013, Jane reported the incident to an LSRHS counselor and alleged that John and Male Student 2 sexually assaulted her.  (*Id.* ¶ 32).  The next week, on November 12, John's housemaster, Leslie Patterson, informed John and his parents of Jane's allegations and asked that John not attend school the next day.  (*Id.* ¶ 33).

Jane also provided a statement concerning the incident to the Sudbury Police Department. (*Id.* ¶ 38).  Ultimately, the Police Department and the Middlesex County District Attorney's Office did not bring charges against John or Male Student 2.  (*Id.* ¶ 40).

The complaint alleges that descriptions of the incident given by Jane at different times have substantial discrepancies.  (*Id.* ¶¶ 35-36).  It further alleges that information provided by Female Student 2, who was communicating with Jane via FaceTime during the incident, contradicts Jane's allegations.  (*Id.* ¶ 37).

### 4.    LSRHS's Internal Policies and Procedures

LSRHS's "Program of Studies and Policy Handbook" governed the school's

---

[1] Jane disputes what transpired during the incident, including whether she was a willing participant and whether she initiated the sexual contact.  On April 24, 2018, she sued the school district and several other parties alleging that they engaged in gender discrimination and otherwise violated state and federal law based on the way they responded to her report of the incident.  *See* Compl. ¶¶ 79-113, *Roe v. Lincoln-Sudbury Reg'l Sch. Dist.*, No. 18-10792 (D. Mass. Apr. 24, 2018).  The complaint in that action alleges that John and Male Student 2 lured Jane away from the football game; that, although Jane tried to resist, John and Male Student 2 forced Jane to perform oral sex and penetrated her with their fingers; and that in the weeks after the incident, John and Male Student 2 engaged in text-message exchanges with Jane in which they admitted to acting improperly.  *See id.* ¶¶ 12-22.  For present purposes, however, the Court must assume the truth of the allegations in John's complaint.

investigation and adjudication of Jane's allegations against John.  (*Id*. ¶ 42).  Students accused of

an infraction have "the right to due process," which includes "the right to respond to the charge

and explain their actions and perceptions."  (Compl. Ex. 1, at 17 ("LSRHS Handbook")).  They

also have "the right to appeal disciplinary decisions to the Superintendent/Principal."  (*Id.*).  For

"very serious offenses," students are given "a hearing in front of a committee of at least three

Administrators."  (*Id.*).  Students "who commit particularly egregious offenses" can be

"excluded from the L-S community for an appropriate period of time."  (*Id.*).

The school district's Discrimination Grievance Procedures, which are also set forth in

LSRHS's handbook, governed the school's response to charges of discrimination.  (*Id.* at 26).

The handbook states that "for each federal and state statute regarding discrimination," there is a

district administrator who "act[s] as an advisor to any/all parties at any stage of these procedures

to ensure that proper steps are followed."  (*Id.*).  It further states that "[a]ll hearings and

investigations must follow due process procedures that guarantee that both parties will have the

right and opportunity to present evidence and witnesses and to question witnesses at all steps."

(*Id.*).  The procedures provide that "[t]he Superintendent/Principal will conduct an investigation

of the formal complaint and give a written decision to both parties."  (*Id.*).  If a party disagrees

with that decision, he must appeal it "in writing, to the School Committee within five school

days after [his] receipt of a written decision."  (*Id.*).

**5.      LSRHS's Investigation of the Incident**

After the Sudbury Police Department closed its investigation, LSRHS began its own

investigation.  (Compl. ¶ 55).  Patterson notified John's parents of that investigation on

November 22, 2013, three weeks after the incident.  (*Id.*).

On December 2, Patterson sent a letter informing John's parents that John would need to

attend a disciplinary hearing in accordance with the procedure set forth in the LSRHS handbook.

4

(*Id.* ¶ 56).  That letter categorized John's offenses as "physical assault" and "inappropriate sexual behavior" and stated that John could bring advocates and an attorney to the hearing.  (*Id.*; *see also* Compl. Ex. 2).

The hearing was held three days later.  (Compl. ¶ 58).  It was attended by the four housemasters, John, John's parents, John's attorney, and an attorney for the district.  (*Id.*).  No witnesses were present.  (*Id.* ¶ 59).

The next day, Patterson informed John's parents that based on the investigation and the hearing, the housemasters had determined that John was "an instigator of both physical and sexual harassment."  (Compl. Ex. 3, at 1).  He further informed them that John could appeal the decision.  (*Id.*).  John was suspended from school for 16 days, prohibited from participating in extracurricular activities, and required to participate in counseling.  (Compl. ¶¶ 61-65).

### 6.    John's Request for Expungement

One year later, in December 2014, John's mother requested that LSRHS remove the December 6, 2013 decision from John's record due to alleged errors leading to the decision.  (*Id.* ¶¶ 66-67).  In response, the principal of LSRHS, Bella Wong, invited John's mother to supplement the record, meet with Patterson to discuss her concerns, or formally appeal the decision.  (*Id.* ¶ 68).

On January 12, 2015, John's mother formally requested that the decision be expunged from his record.  (*Id.* ¶ 69).  On March 26, 2015, Patterson informed John's mother that "all are on board with [Patterson] editing the language in the behavior report, but the report will still exist, as will the record of suspension."  (*Id.* ¶ 70).  Two weeks later, John's mother appealed.  (*Id.* ¶ 71).  In response, Wong told John's parents that legal counsel had advised her to not modify John's record, but that she planned to reevaluate information and confer with legal counsel again.  (*Id.* ¶ 72).

On May 4, 2015, John's parents again requested that LSRHS expunge John's suspension from his record and stated that John "would not be checking the 'No' box concerning his suspension [on his college applications] unless [LSRHS] cleared it from his record." (*Id.* ¶ 73). Later that month, Wong informed John's mother that she was still speaking with the district's counsel. (*Id.* ¶ 74).

### 7.   The Department of Education's Investigation into the District's Title IX Compliance

On April 30, 2014, Jane filed a complaint with the United States Department of Education's Office for Civil Rights ("OCR") contending that LSRHS violated Title IX in its response to the November 1, 2013 incident. (*Id.* ¶ 81). OCR opened an investigation into Jane's allegations and sent a data request to the district concerning the incident. (*Id.* ¶ 84). As part of its response to that request, the district described its findings concerning the November 1, 2013 incident involving Jane, John, and Male Student 2:

> Lincoln-Sudbury did not feel that it had enough evidence to confirm whether the incidents on [] constituted sexual harassment, sexual assault, physical assault, and/or consensual sexual activity. . . . Lincoln-Sudbury did feel there was sufficient evidence to support that Male Student #1 and Male Student #2 had engaged in inappropriate conduct in violation of the core values of the District.

(*Id.* ¶ 89 (emphasis omitted)).[2]

The district continued to communicate with OCR concerning OCR's investigation. (*Id.* ¶ 91). On September 30, 2015, OCR notified the district that it would resolve its investigation of Jane's complaint if the district issued the results of its own Title IX investigation concerning the incident to Jane. (*Id.* ¶ 92).

The following day, on October 1, the district sent a letter to John's parents stating that the

---

[2] The district refers to John as "Male Student #1" in its communication with OCR. (Compl. ¶ 89 n.3). Brackets represent redactions in documents produced by OCR in response to FOIA requests. (*Id.* ¶ 89 n.2).

LSRHS Title IX investigation was inconclusive. (*Id.* ¶¶ 75, 93). The letter stated that "[t]he District was not able to reliably determine" whether the November 1, 2013 incident occurred as described by Jane. (*Id.* ¶ 75). Jane and Male Student 2 received similar letters. (*Id.* ¶¶ 94-95).

The district also provided OCR copies of the letters sent to John, Jane, and Male Student 2. (*Id.* ¶ 96). OCR responded by stating that those letters, which stated that LSRHS "could not find whether the alleged incident occurred," were inconsistent with LSRHS's previous statement that it had "found sufficient evidence that what was alleged did occur." (*Id.* ¶ 97). In response, the district explained that while John and Male Student 2 had violated the student code of conduct, there was insufficient evidence to conclude that they had committed an offense under Title IX. (*Id.* ¶ 98).

On October 14, 2015, Jane's parents appealed the district's Title IX findings to the school committee. (*Id.* ¶ 99). On February 3, 2016, the school committee affirmed the findings and found that the investigation was appropriate and non-discriminatory. (*Id.* ¶ 106).

Following the school committee's decision, OCR continued its investigation into the district's compliance with Title IX. (*Id.* ¶ 108). The complaint alleges that OCR kept its investigation open because Jane's mother complained to the OCR after the school committee affirmed the district's findings. (*Id.* ¶¶ 107-08).

In early February 2015, the district informed OCR that the *Boston Globe* had contacted LSRHS concerning OCR's open Title IX investigation. (*Id.* ¶ 118). OCR noted that the open investigation had already been mentioned in a 2014 *Huffington Post* article. (*Id.*). Later that month, the *MetroWest Daily News* published an article stating that LSRHS was under federal investigation concerning a sexual-assault claim. (*Id.* ¶ 119).

On August 9, 2016, the district's counsel told OCR that the district wanted to resolve the

investigation because it did not want to continue to appear in OCR's database as having an open Title IX complaint. (*Id.* ¶ 120). The next day, OCR informed the district that it would likely find a Title IX violation because LSRHS did not provide Jane with written results of its Title IX investigation. (*Id.* ¶ 121). In that conversation, the district's counsel allegedly "made clear that the district would like to do anything possible to resolve [the investigation] ASAP." (*Id.*).

On October 13, 2016, the district "express[ed] frustration" to OCR about the delay in resolving the investigation and noted that it had previously provided—at OCR's request—John, Jane, and Male Student 2 with Title IX decision letters on October 1, 2015. (*Id.* ¶ 122).

On August 14, 2017, OCR requested that the district retract the October 1, 2015 letters because, according to OCR, they were "incorrect" insofar as they stated that the LSRHS investigation was inconclusive:

> [T]he District originally provided written notice to the respondents but not to the complainant, so OCR asked that the District [to] issue written notice to the complainant. The [] letters, however, stated that the investigations were inconclusive even though they were not. In an interview with [] on 12/14/15, she acknowledged this error. At OCR's request, the District held off on issuing corrected notice.

> At this time, OCR would like the District to issue corrected notice prior to OCR closing this complaint. The corrected notice to the recipients should rescind the [] letters and refer them to the findings as described in the original letters from [] and []. The corrected notice to the complainant should rescind the [] letter and explain the District's findings consistent with the findings described in the [] and [] letters.

(*Id.* ¶ 123 (emphasis omitted)). Shortly after receiving OCR's request, the district drafted a letter retracting the October 1, 2015 letters. (*Id.* ¶¶ 124-27). It then sought and received approval on the letter from OCR. (*Id.*).

On August 30, 2017, the district sent that letter, dated August 24, 2017, to John and his parents. (*Id.* ¶¶ 77-78, 128). It stated that the district was "writing to clarify the results of Lincoln-Sudbury's . . . November [2013] Title IX investigation." (*Id.* ¶ 78). It further stated that

the results of that investigation were "consistent with the letter sent . . . on December 6, 2013, not the letter sent . . . on October 1, 2015." (*Id.*). The complaint alleges that Aida Ramos, Peter Elenbaas, and Bella Wong sent the retraction letter even though they knew that the October 1, 2015 letter was accurate. (*Id.* ¶ 131)

The day after it received copies of the retraction letter, OCR informed Wong that it had concluded its Title IX investigation. (*Id.* ¶ 130). It stated that the district had found sexual misconduct by a preponderance of the evidence. (*Id.*). It further stated that the district issued inaccurate notice letters on October 1, 2015, which were retracted at OCR's request, and that the district's delay in issuing the retraction letters was also at OCR's request pending the conclusion of its investigation. (*Id.*).

### 8.     LSRHS's Records of John's Discipline and Suspension

The complaint alleges that the district continues to maintain records concerning its investigation and suspension of John. (*Id.* ¶ 140). Those records include e-mails; the December 2, 2013 charge letter; the December 6, 2013 decision letter; the August 24, 2017 retraction letter; a disciplinary summary; and documents "compiled by Lincoln-Sudbury in the course of its Title IX investigation . . . ." (*Id.*).

In May 2015, John's parents informed LSRHS that John would have to disclose his suspension on college applications unless LSRHS expunged it from his record. (*Id.* ¶ 73). About two years later, in April 2017, a college to which John had applied contacted LSRHS because his application indicated that he had been suspended. (*Id.* ¶ 141).

### B.     Procedural Background

John filed the complaint in this action on August 21, 2020. The complaint asserts three claims. Count 1 alleges that Wong, Ramos, Elenbaas, Patterson, Medeiros, Crawford, and Burke (collectively, the "Individual Defendants") violated John's due-process rights under the

Fourteenth Amendment and statutory rights under Title IX.  Count 2 alleges that the district and the school committee failed to adequately train and supervise district employees concerning due-process requirements and Title IX requirements in sexual-misconduct investigations.  Count 3 alleges that the district and the school committee violated John's due-process rights by directing Ramos and Elenbaas to retract LSRHS's initial Title IX findings.  Defendants have moved to dismiss the complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## II.   <u>Standard of Review</u>

To survive a motion to dismiss, a complaint must state a claim that is plausible on its face.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  For a claim to be plausible, the "[f]actual allegations must be enough to raise a right to relief above the speculative level . . . ." *Id.* at 555 (internal citations omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  When determining whether a complaint satisfies that standard, a court must assume the truth of all well-pleaded facts and give the plaintiff the benefit of all reasonable inferences.  *See Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1, 6 (1st Cir. 2005)).

III.    **Analysis**

A.      **Statute of Limitations**

As an initial matter, defendants contend that plaintiff's claims are barred by the applicable statute of limitations.

Section 1983 does not include a limitations period; therefore, courts considering § 1983 claims apply the forum state's limitations period governing personal-injury causes of action. *See Álamo-Hornedo v. Puig*, 745 F.3d 578, 580 (1st Cir. 2014).  In Massachusetts, that period is generally three years. *See* Mass. Gen. Laws ch. 260 § 2A ("Except as otherwise provided, actions of tort . . . shall be commenced only within three years next after the cause of action accrues.").

The limitations period for claims under Title IX is less settled.  The First Circuit has yet to decide the issue, but courts in this District have held that, as with claims under § 1983, the forum state's limitations period for personal-injury claims applies.  *See, e.g., Doe v. Town of Bourne*, 2004 WL 1212075, at *11 (D. Mass. May 28, 2004); *LeGoff v. Trustees of Bos. Univ.*, 23 F. Supp. 2d 120, 127 (D. Mass. 1998).[3]  Indeed, the parties appear to agree.  Accordingly, the Court will apply a three-year limitations period to all of plaintiff's claims.

Under Massachusetts law, if a person entitled to bring a cause of action is younger than 18 years old when that action accrues, the limitations period is tolled until he reaches 18.  *See*

---

[3] Every circuit court to consider the issue has similarly decided that the limitations period applicable to personal-injury claims under the forum state's law applies to claims under Title IX.  *See Twersky v. Yeshiva Univ.*, 579 F. App'x 7, 9 (2d Cir. 2014); *Bougher v. University of Pittsburgh*, 882 F.2d 74, 77-78 (3d Cir. 1989); *Wilmink v. Kanawha Cty. Bd. of Educ.*, 214 F. App'x 294, 296 (4th Cir. 2007); *King-White v. Humble Indep. Sch. Dist.*, 803 F.3d 754, 759 (5th Cir. 2015); *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 729 (6th Cir. 1996); *Cetin v. Purdue Univ.*, 1996 WL 453229, at *2 (7th Cir. Aug. 7, 1996); *Egerdahl v. Hibbing Cmty. Coll.*, 72 F.3d 615, 618 (8th Cir. 1995); *Stanley v. Trustees of California State Univ.*, 433 F.3d 1129, 1134-36 (9th Cir. 2006); *Varnell v. Dora Consol. Sch. Dist.*, 756 F.3d 1208, 1213 (10th Cir. 2014); *M.H.D. v. Westminster Sch.*, 172 F.3d 797, 803 (11th Cir. 1999); *Dasisa v. University of D.C.*, 2006 WL 3798886, at *1 (D.C. Cir. Oct. 3, 2006).

Mass. Gen. Laws ch. 260, § 7; *Pettengill v. Curtis*, 584 F. Supp. 2d 348, 364 (D. Mass. 2008).[4]
Here, plaintiff turned 18 in November 2016; he filed his complaint on August 21, 2020, nearly
four years later.  Defendants contend that the limitations period began to run on all claims in
November 2016 and that therefore the statute of limitations bars the complaint in its entirety.
Plaintiff contends, however, that the limitations period did not begin to run until LSRHS
retracted its finding that its Title IX investigation was inconclusive.  That retraction occurred on
August 24, 2017, less than three years before plaintiff filed his complaint.[5]

Count 1 asserts a claim for violation of due-process rights under the Fourteenth
Amendment and violation of statutory rights under Title IX.  Count 2 asserts a *Monell* claim
against the district and the school committee for failure to provide adequate training and
supervision to employees of the district "concerning due process and Title IX requirements for
investigating and addressing an allegation of sexual misconduct made against a student."
(Compl. ¶ 174).  The complaint indicates that Counts 1 and 2 are premised not only on
allegations that concern the 2013 investigation and suspension of plaintiff (*see, e.g.*, *id.* ¶ 154(a)-
(i); *id.* ¶ 174(a)-(b)), but also on those that concern the 2017 retraction letter (*see, e.g.*, *id.* ¶ 154
(i)-(p); *id.* ¶ 174(c)).

To the extent that those claims are premised on allegations concerning the 2013
investigation and suspension, they are time-barred.  For example, the complaint alleges that
defendants violated his due-process rights and rights under Title IX by failing to notify him of

---

[4] Although state law supplies the applicable statute of limitations, federal law determines the accrual date
for federal causes of action.  *See Álamo-Hornedo*, 745 F.3d at 581.  "Under federal law, such a cause of action
accrues 'when the plaintiff knows, or has reason to know of the injury on which the action is based.'" *Id.* (quoting
*Morán Vega v. Cruz Burgos*, 537 F.3d 14, 20 (1st Cir. 2008)).

[5] The complaint alleges that the retraction letter was sent on August 30, 2017, even though it was dated
August 24, 2017.  (Compl. ¶ 128).  Because plaintiff filed his complaint on August 21, 2020—within three years of
either date—that discrepancy is immaterial at this stage.

the standard of proof that applied to the December 2013 proceedings.  (*See id.* ¶ 154 (e)).

Plaintiff knew of any injury arising from that action, such as his suspension from school and

denial of participation in extracurricular activities, as early as December 2013.  (*See id.* ¶¶ 159,

178 (alleging that plaintiff's injuries include suspension from school and ban from

extracurricular activities)).  The limitations period therefore began to run in November 2016,

when plaintiff turned 18, as to claims based on injuries suffered as a result of actions by

defendants related to the investigation and suspension.

Plaintiff contends that the October 1, 2015 letter, which informed his parents that

LSRHS's Title IX investigation had been inconclusive, "granted him substantial relief" and

"cured" the "injurious portions of the 2013 findings."  (Pl. Opp. at 16-17).  But that does not

appear to be the case.  The October 1, 2015 letter indeed notified plaintiff's parents that the Title

IX investigation was "inconclusive" and therefore "at [that] time, with regard to Title IX,

Lincoln-Sudbury [would] not take any further action with regard to the alleged incident."

(Compl. Ex. 4, at 1).  However, that letter did not cure any injuries he allegedly suffered in

December 2013, when he was suspended and otherwise punished in accordance with LSRHS's

Discipline Code; it merely indicated that no "further" action would be taken "with regard to Title

IX" against plaintiff.  (*Id.*).

To the extent that Counts 1 and 2 are premised on allegations concerning the 2017

retraction letter, however, they are timely.  For example, the complaint alleges that defendants

violated plaintiff's due-process rights and rights under Title IX by failing to provide him a

meaningful opportunity to be heard before the issuing the retraction letter.  (*See* Compl.

¶ 154(p)).  Because the retraction did not occur until August 24, 2017, it would not have been

possible for plaintiff to be aware of any injury arising from that action until that date.  (*See, e.g.*,

*id.* ¶¶ 159, 178 (alleging that plaintiff's injuries include LSRHS's "continued maintenance of adverse findings and suspension records")).

Count 3 asserts a claim under § 1983 against the district and the school committee based on their retraction of the original Title IX findings.  That claim plainly did not accrue until August 24, 2017—the date of the retraction letter—and therefore is not barred by the statute of limitations.

Accordingly, Counts 1 and 2 are barred to the extent that they are premised on injuries that arise from the December 2013 investigation and suspension of plaintiff, but not to the extent that they are premised on injuries that arise from the August 2017 retraction letter.  Count 3, which is based entirely on the retraction letter, is not barred.

### B.      Count 1

Count 1 appears to assert two causes of action against the Individual Defendants in their individual and official capacities:  a claim under § 1983 for violation of plaintiff's due-process rights under the Fourteenth Amendment and a claim for violation of plaintiff's statutory rights under Title IX.  The Court will separately consider whether the complaint plausibly alleges either cause of action.

### 1.      Whether the Complaint States a Claim under § 1983

Defendants contend that the complaint fails to state a claim under § 1983 because plaintiff was afforded due process.

Section 1983 provides a private cause of action against any person who, under color of state law, deprives another of "any rights, privileges, or immunities secured by the Constitution and [federal] laws."  42 U.S.C. § 1983.  To maintain a cause of action under § 1983, a plaintiff must allege "deprivation of a federally secured right."  *Harrington v. City of Nashua*, 610 F.3d 24, 28 (1st Cir. 2018).  Here, the complaint alleges that defendants deprived plaintiff of due

14

process in violation of the Fourteenth Amendment.

To assert a procedural due-process claim under § 1983, a plaintiff must show that he was deprived of a protected interest and that the deprivation was accomplished without due process of law. *See Khelfaoui v. Lowell Sch. Comm.*, 496 F. Supp. 3d 683, 691 (D. Mass. 2020) (citing *Perez-Acevedo v. Rivero-Cubano*, 520 F.3d 26, 30 (1st Cir. 2008); *Harron v. Town of Franklin*, 660 F.3d 531, 537 (1st Cir. 2011)).  Here, the complaint alleges that plaintiff was deprived of not only a protected property interest—pursuit of his public education—but also a protected liberty interest—"his good name, reputation, honor, and integrity".  (Compl. ¶¶ 147-48).

At this stage, defendants do not contest that such interests are protected under the Due Process Clause or that plaintiff was, at least to some degree, deprived of them.  *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574 (1975) ("[A] student's legitimate entitlement to a public education [is] a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause."); *id*. ("The Due Process Clause also forbids arbitrary deprivations of liberty.  Where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." (internal quotation marks and citation omitted)).

Instead, defendants contend that plaintiff was afforded due process because he had notice of the December 2013 disciplinary hearing and the opportunity to be heard at that hearing. Notice and the opportunity to be heard have "traditionally and consistently been held to be the essential requisites of procedural due process." *Haidak v. University of Massachusetts-Amherst*, 933 F.3d 56, 66 (1st Cir. 2019) (quoting *Gorman v. University of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988)).  In the school-disciplinary context, "the opportunity to be heard requires 'some

15

kind of hearing.'" *Id.* (quoting *Goss*, 419 U.S. at 579) (emphasis omitted).  That hearing must occur before the deprivation of a protected interest.  *See Gorman*, 837 F.2d at 12-13 ("[N]otice and a fair hearing require that a person be heard prior to being deprived of a vital legally protected interest.").  The "timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Goss*, 419 U.S. at 579.

Defendants' focus, however, is too narrow.  As noted, Count 1 is not only based on the 2013 disciplinary hearing; it is also based on the 2017 retraction letter.  The complaint alleges that the retraction letter violated plaintiff's right to due process because, among other reasons, defendants failed to notify him of their intent to retract the letter stating that their Title IX investigation was inconclusive and because they did not provide him a meaningful opportunity to be heard before issuing that retraction.  (*See, e.g.*, Compl. ¶ 154(j)-(p)).  The complaint therefore plausibly alleges a claim for a violation of plaintiff's due-process rights as to the 2017 retraction letter.  Defendants make no argument concerning the adequacy of the procedure related to that letter.

Count 1 does not, however, state a claim as to all defendants.  The complaint alleges that Wong, Ramos, and Elenbaas were involved in drafting and sending the 2017 retraction letter.  It does not allege that any of the other individual defendants—Medeiros, Crawford, Burke, and Patterson—were responsible for that retraction.  Instead, it alleges only that they were involved in the 2013 disciplinary process.  And because Count 1 is time-barred to the extent that it is premised on allegations concerning the 2013 disciplinary process, the complaint fails to state a claim against Medeiros, Crawford, Burke, and Patterson.  *See Denicola v. Potter*, 2019 WL 3842936, at *3 (D. Mass. Aug. 15, 2019) ("[A] party can only be liable under § 1983 if he is

personally involved in the alleged constitutional violation.").

Accordingly, the complaint plausibly states a claim that Wong, Ramos, and Elenbaas violated the Fourteenth Amendment by depriving plaintiff of protected property and liberty interests without due process, but not as to the other Individual Defendants.[6]

### 2.      Qualified Immunity

Wong, Ramos, and Elenbaas further contend that they are protected by the doctrine of qualified immunity. Qualified immunity protects public employees "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity is determined according to a two-part test. *See Maldonado v. Fontanes*, 568 F.3d 263, 268-69 (1st Cir. 2009). The court must determine (1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the defendant's alleged misconduct. *See id*.

As noted, the complaint plausibly alleges a violation of plaintiff's right to due process under the Fourteenth Amendment. The remaining inquiry is therefore limited to whether that right was clearly established. *See Jordan v. Town of Waldoboro*, 943 F.3d 532, 548 (1st Cir. 2019) ("We have already concluded that the officers violated a federal constitutional right, so the sole question is whether the unlawfulness of their conduct was clearly established at the time."

---

[6] As noted, Count 1 asserts claims against the Individual Defendants in their individual and official capacities. It is well-settled that "[a] suit against a public official in his official capacity is a suit against the government entity." *Rosaura Bldg. Corp. v. Municipality of Mayaguez*, 778 F.3d 55, 62 (1st Cir. 2015) (citing *Surprenant v. Rivas*, 424 F.3d 5, 19 (1st Cir. 2005); *Wood v. Hancock Cnty. Sheriff's Dep't*, 354 F.3d 57, 58 n.1 (1st Cir. 2003)). The § 1983 claims against the Individual Defendants in their official capacities are therefore claims against the Lincoln-Sudbury school district and school committee. As a result, they are duplicative of the *Monell* claims asserted in Counts 2 and 3, discussed below.

(internal quotation marks omitted)); *Gray v. Cummings*, 917 F.3d 1, 10 (1st Cir. 2019) ("[W]e already have decided that a jury could find that Cummings violated Gray's Fourth Amendment rights.  We must now determine whether the alleged right was clearly established at the time of Cummings's violation.").

More than thirty years ago, the First Circuit found that it had "long been 'clearly established' that due process safeguards must be afforded" when "persons are deprived of property interests."  *Amsden v. Moran*, 904 F.2d 748, 752 (1st Cir. 1990) (citing *Paul v. Davis*, 424 U.S. 693, 711 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 569-70 (1972)).  Here, defendants contend that they afforded plaintiff due process during the initial investigatory process.  Again, however, plaintiff's due-process claim is also based on the 2017 retraction letter. And assuming the allegations of the complaint to be true, no reasonable school official would have understood that their conduct—issuing the letter, which they allegedly knew to be unsupported by the underlying evidence, without notice or opportunity to be heard—would satisfy due-process requirements.  (*See* Compl. ¶¶ 118-30; ¶ 154 (j)-(p)).  Indeed, defendants offer no argument to the contrary.

Accordingly, defendants' motion to dismiss Count 1 will be denied to the extent that it seeks dismissal of the § 1983 claim as to Wong, Ramos, and Elenbaas in their individual capacities.

### 3.     Title IX

Count 1 also appears to assert a claim under Title IX against defendants in their individual and official capacities.  Defendants contend that individual administrators cannot be found liable under Title IX and that, in any event, the complaint does not allege gender discrimination.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a). It is well-settled that school administrators cannot be found liable under Title IX in their individual capacities.  *See Doe v. Pawtucket Sch. Dep't*, 969 F.3d 1, 11 (1st Cir. 2020) (citing *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 641 (1999)); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 257 (2009) ("Title IX . . . has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals."); *Lipsett v. University of Puerto Rico*, 864 F.2d 881, 901 (1st Cir. 1988) ("[T]he separate liability of the supervisory officials at the University must be established, if at all, under section 1983, rather than under Title IX.").  To the extent that Count 1 asserts a claim against the Individual Defendants in their individual capacities, it will therefore be dismissed.

To the extent that it asserts a claim against them in their official capacities, it is effectively a claim against the school district and school committee.  *See Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 609 n.1 (8th Cir. 1999) ("Suits against school officials in their official capacity are treated as suits against the school district itself."); *Smith v. Metropolitan Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1021 n.3 (7th Cir. 1997) (noting that a Title IX suit against school officials in their official capacities was essentially a suit against the school district and school board).

Plaintiff appears to contend that the complaint asserts an "erroneous outcome" claim under Title IX.[7]  To assert such a claim, the complaint must allege (1) "particular facts sufficient

---

[7] Title IX makes educational institutions liable under several theories of liability, including erroneous outcome, selective enforcement, deliberate indifference, and archaic assumption.  *See, e.g.*, *Doe v. Western New England University*, 228 F. Supp. 3d 154, 187 & n.34 (D. Mass. 2016).  In his opposition brief, plaintiff focuses exclusively on the "erroneous outcome" theory of liability.  (*See* Pl. Opp. at 15-16).  To the extent that the claim is alternatively asserted in the complaint under a different theory of liability, it has been abandoned.  *See United States*

to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding."  *Yusuf v. Vassar College*, 35 F.3d 709, 716 (2d Cir. 1994); *see also Doe v. Trustees of Boston College*, 892 F.3d 67, 90 (1st Cir. 2018); *Doe v. Harvard University*, 462 F. Supp. 3d 51, 60 (D. Mass. 2020).[8]

Here, even if the complaint plausibly alleges that the circumstances surrounding the 2017 retraction letter "cast some articulable doubt" on the accuracy of that letter, it does not specifically allege that gender bias was a motivating factor behind the allegedly erroneous outcome.  In fact, it expressly alleges otherwise.  It alleges that the district issued the retraction letter so that OCR would close the Title IX investigation of the district resulting from Roe's complaint.  (Compl. ¶¶ 118-30).  Specifically, it alleges that the district issued that letter "as a means of placating OCR and as quid pro quo for OCR's closure of the investigation into Roe's Title IX complaint."  (*Id.* at 29).  Therefore, according to the complaint itself, the district's reputational concerns, coupled with pressure from OCR, motivated it to issue the retraction.

It is certainly true that in some circumstances a concern about negative publicity, or politically motivated pressure, could reflect a form of gender bias.  For example, in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), a case involving alleged sexual misconduct by a male student and a subsequent university investigation, the court concluded that the complaint adequately alleged that the university's decision (in favor of the female accuser) was motivated

---

*v. Villalona-Aguasvivas*, 2009 WL 5108431, at *2 n.1 (D. Mass. Dec. 17, 2009) ("[S]ince this issue was not briefed, the court deems it abandoned.").

[8] In *Doe*, the First Circuit applied the *Yusuf* framework to analyze an "erroneous outcome" claim under Title IX.  *See* 892 F.3d at 90-93.  It did not, however, formally adopt that framework as the circuit's standard for analyzing "erroneous outcome" claims.  *See id.* at 90.  In that case, the parties agreed that the *Yusuf* framework governed such claims.  *See id.*  The same is true here.  (*See* Def. Mem. at 9; Pl. Opp. at 15).

20

by gender bias.  It first reasoned that it was plausible to infer that the university decisionmakers were influenced by bias because the complaint alleged that "the evidence substantially favor[ed] one party's version of a disputed matter," but that the decisionmakers "form[ed] a conclusion in favor of the other side (without an apparent reason based in the evidence)." *Id.* at 57.  It then reasoned that it was plausible to infer that the decisionmakers were motived by gender bias specifically because the complaint alleged that "during the period preceding the disciplinary hearing, there was substantial criticism of the University, . . . accusing the University of not taking seriously complaints of female students alleging sexual assault by male students." *Id*.  It also noted that university administrators were "cognizant of, and sensitive to, these criticisms." *Id.*  And it went on to state that "[t]here is nothing implausible or unreasonable about the Complaint's suggested inference that the panel adopted a biased stance in favor of the accusing female and against the defending male varsity athlete in order to avoid further fanning the criticisms that Columbia turned a blind eye to such assaults." *Id.* at 58 (footnote omitted).

Here, plaintiff contends that he is entitled to the same inference—that the district was motivated by gender bias because it sought to protect itself from criticism that it had failed to protect female students from sexual assault.  But there is a crucial distinction between the *Columbia* case and the present dispute.  The criticism against Columbia specifically concerned its alleged failure to "tak[e] seriously complaints of female students alleging sexual assault by male students." *Id.* at 57.  In substance, that complaint alleged that Columbia had in the past engaged in a form of gender bias (favoring male students over female students in investigations of sexual assault) that was overcorrected by another form of gender bias (favoring female students over male students).  By contrast, the alleged concern of Lincoln-Sudbury was that it would be criticized because the OCR Title IX investigation of Roe's complaint remained open.

(*See* Compl. ¶¶ 118-22).  It was not that the district favored one gender over another in sexual-assault investigations.  Indeed, the district's alleged response to that criticism—informing OCR that it "would like to do anything possible to resolve [the open investigation] ASAP" and then doing what OCR stated was necessary to close the investigation—suggests that the district was not acting based on gender bias, but instead based on a desire to have that investigation closed.  (*Id.* ¶ 121).

That, of course, may still be a form of bias—that is, the district's action could have been improperly motivated by a desire to curry favor with the federal government.  And as the complaint alleges, such a bias could tarnish a deliberative process to a point where decisionmakers make findings unsupported by, or even contrary to, the evidence.  But without more, that is not improper gender bias prohibited by Title IX.  *See Harvard Univ.*, 462 F. Supp. 3d at 62 (concluding that the complaint failed to assert a claim under Title IX because the allegations, including external pressure to aggressively handle allegations of sexual misconduct, supported "a claim of bias against alleged perpetrators of sexual misconduct," but not "a claim of bias based on gender"); *Doe v. University of Massachusetts-Amherst*, 2015 WL 4306521, at *9 (D. Mass. July 14, 2015) (dismissing claim under Title IX where "none of the facts [pleaded] in [the] complaint indicate [plaintiff's] disciplinary proceeding was tainted by gender bias, as opposed to bias against those accused of sexual harassment").[9]

The complaint perhaps could have plausibly alleged facts amounting to gender bias.  However, it did not.  The Court must accept the plausible allegations of the complaint at face

---

[9] In *Columbia University*, the Second Circuit also held that "the temporary presumption afforded to plaintiffs in employment discrimination cases under Title VII applies to sex discrimination plaintiffs under Title IX as well."  831 F.3d at 56.  The First Circuit has not yet taken a position on whether such a presumption applies to Title IX claims.  *See Haidak*, 933 F.3d at 74 n.11; *Trustees of Boston College*, 892 F.3d at 90 n.13.  Here, the Court need not decide whether that presumption applies to such claims because even if it did, it would not affect the outcome of this case.

value, and may not ascribe motives to defendants that are not specifically set forth in the complaint.  Accordingly, to the extent that Count 1 asserts a claim under Title IX, it will be dismissed.

### C.    Count 2

Count 2 asserts a claim under § 1983 against the district and school committee based on their alleged failure to train and supervise employees concerning due-process and Title IX requirements related to investigations of sexual misconduct.  It alleges that (1) the district and school committee failed to promulgate adequate procedures concerning sexual-misconduct investigations and (2) to the extent that any such procedures existed, the district and committee failed to train and supervise their employees as to those procedures.

A municipality may not be held vicariously liable under § 1983 for the acts of its employees.  *See Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).  Under *Monell* and its progeny, however, a municipality may be liable for its failure to train or supervise its employees when that failure "causes a constitutional violation or injury" and "amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *DiRico v. City of Quincy*, 404 F.3d 464, 468 (1st Cir. 2005) (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

To assert a failure-to-train claim, the complaint must allege, among other things, that "municipal decisionmakers either knew or should have known that training was inadequate but nonetheless exhibited deliberate indifference to the unconstitutional effects of those inadequacies."  *Gray v. Cummings*, 917 F.3d 1, 14 (1st Cir. 2019) (quoting *Haley v. City of Boston*, 657 F.3d 39, 52 (1st Cir. 2011)).  Typically, "to demonstrate deliberate indifference for purposes of failure to train," the complaint must allege a "pattern of similar constitutional violations by untrained employees."  *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 62 (2011)).

Here, the complaint makes no such allegations.  As an initial matter, for the reasons discussed above, Count 2 is time-barred to the extent that it is premised on allegations concerning the 2013 investigation and suspension; it is timely only to the extent that it is premised on allegations concerning the 2017 retraction letter.  To assert a failure-to-train claim, the complaint must therefore allege that the district and school committee's failure to train (1) caused the alleged violation of plaintiff's due-process rights when the retraction letter was issued and (2) amounted to deliberate indifference of the rights of those with whom the Lincoln-Sudbury employees come in contact.  *See DiRico*, 404 F.3d at 468.

The complaint falls far short of alleging deliberate indifference in that respect.  *See Hayden v. Grayson*, 134 F.3d 449, 456 (1st Cir. 1998) ("The liability criteria for 'failure to train' claims are exceptionally stringent . . . .").  It does not include factual allegations that indicate that any failure to train was a "deliberate or conscious choice" by the district or school committee. *Id.*  For example, it fails to allege a "pattern of similar constitutional violations by untrained employees."  *Gray*, 917 F.3d at 14.  Of course, it is true, as plaintiff contends, that "proof of such facts is not necessary at the pleading stage."  (Pl. Opp. at 19).  But such facts must still be plausibly alleged.  Here, the complaint only alleges a single instance of school officials capitulating to OCR's demands in order to have a Title IX investigation closed.  As noted, it is plausible that that action violated plaintiff's due-process rights.  But it does not, by itself, represent a pattern of constitutional violations that would show deliberate indifference on the part of the district or school committee.

Plaintiff contends that the complaint satisfies the deliberate-indifference standard because the entire series of events—from the initial proceeding through the retraction letter—"combine to demonstrate a pervasive lack of training and competence."  (Pl. Opp. at 19).  But even assuming

24

that it is appropriate to consider the allegations from 2013 and that those allegations amount to constitutional violations, it still does not permit a reasonable inference that a lack of training caused those violations.  Even making those assumptions, the events would represent a series of different constitutional violations, rather than a "pattern of *similar* constitutional violations by untrained employees."  *Gray*, 917 F.3d at 14 (emphasis added).

Accordingly, the Court will grant defendants' motion to dismiss to the extent that it seeks to dismiss Count 2.

### D.    Count 3

Count 3 also alleges a claim under § 1983 against the district and school committee.  It alleges that the district and school committee had final authority over student disciplinary decisions, including the decision to issue the 2017 retraction letter, and that they violated plaintiff's due-process rights when they through counsel directed Ramos and Elenbaas to issue that letter.

Under *Monell*, "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers."  *Monell*, 436 U.S. at 690.  A plaintiff can establish an official policy by showing that the alleged constitutional injury was caused by "a person with final policymaking authority."  *Rodríguez-García v. Miranda-Marín*, 610 F.3d 756, 769 (1st Cir. 2010) (quoting *Welch v. Ciampa*, 542 F.3d 927, 941 (1st Cir. 2008)).  "Although liability may not be imposed on a municipality for a single instance of misconduct by an official *without* final policymaking authority, liability may be imposed on a municipality for 'a single decision by a final policymaker.'"  *Id.* (quoting *Welch*, 542 F.3d at 942).

Here, defendants do not put forth any substantive argument as to why Count 3 should be dismissed.  They do not appear to contest the complaint's allegation that the district and school committee had final authority over student disciplinary decisions.  Nor do they address the allegation that the district and school committee directed Ramos and Elenbaas to issue the 2017 retraction letter.  Even though they contend that Count 3 should be dismissed, their argument focuses almost entirely on the allegations and *Monell* doctrine related to Count 2.  But Count 3 asserts a *Monell* claim premised on a different theory of liability (acting as a final policymaker) and different factual allegations (directing Ramos and Elenbaas to issue the retraction letter).

Furthermore, and in any event, Count 3 plausibly alleges a claim that the district and school committee, as final policymakers, are liable under § 1983 for directing Ramos and Elenbaas to issue the retraction letter.  As noted, the complaint plausibly alleges that the decision to issue that letter—absent notice and the opportunity to be heard and contrary to the underlying evidence—violated plaintiff's right to due process.  And according to the complaint, that action was taken at the direction of the district's counsel, acting on behalf of the district and school committee, which had final authority concerning disciplinary decisions.  (*See* Compl. ¶¶ 123-36, 182-83).  Even though liability typically may not be imposed on a municipality for a single instance of misconduct, it may be imposed for "a single decision by a final policymaker."  *See Welch*, 542 F.3d at 942.

Accordingly, the Court will deny defendants' motion to dismiss to the extent that it seeks to dismiss Count 3.

## IV.  <u>Conclusion</u>

For the foregoing reasons, defendants' motion to dismiss is GRANTED in part.  Count 1 is DISMISSED to the extent that it is premised on injuries that arise from the 2013 investigation and suspension of plaintiff; to the extent that it asserts a claim against Medeiros, Crawford,

26

Burke, and Patterson; and to the extent that it asserts a claim under Title IX.  Count 2 is

DISMISSED in its entirety.  Defendants' motion to dismiss is otherwise DENIED.

**So Ordered.**

                                                              /s/ F. Dennis Saylor IV
                                                              F. Dennis Saylor IV
Dated:  August 27, 2021                      Chief Judge, United States District Court